**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Civil No. 11-570 PAM/JSM



---

InCompass IT, Inc. (a Minnesota corporation),

    Plaintiff,

v.

XO Communications Services, Inc. (a Delaware corporation), and XO Communications, L.L.C. (a Delaware limited liability company),

    Defendants.

**COMPLAINT AND JURY DEMAND**

---

As and for its Complaint for damages against defendants XO Communications Services, Inc., and XO Communications, L.L.C., plaintiff InCompass IT, Inc., states and alleges as follows:

## PARTIES

1. At all relevant times, InCompass IT, Inc. ("InCompass"), with headquarters and a data center at 300 2nd Street NW, New Brighton, MN 55112, was, and still is, a provider of managed IT services through a combination of managing, monitoring and collocating servers and IT infrastructure as well as providing hosted applications and desktops through its cloud services for non-profits, healthcare, small-to-medium sized businesses generally, and IT value-added resellers ("VARs").

2. On information and belief, XO Communications Services, Inc. ("XOCS"), a Delaware corporation, was, and still is, a provider of managed voice, data, and IP services through a combination of nationwide and metro networks and broadband

MAR 07 2011

wireless capabilities with a Minnesota office and data center at 1200 Washington Avenue North, Minneapolis, MN 55401, and headquarters at 13865 Sunrise Valley Drive, Herndon, VA 20171.

3. On information and belief, XO Communications, L.L.C. ("XOC"), a wholly-owned subsidiary of its only member, XO Holdings, Inc. ("XOH"), maintains a sales office at 1200 Washington Avenue North, Minneapolis, MN 55401, is headquartered at 11111 Sunset Hills Road, Reston, VA 20190, and is a citizen of Virginia and Delaware but not Minnesota because an LLC's citizenship is that of its members.

4. Service of process on XOCS will be made by delivering a copy of the Summons and Complaint to its registered agent for service of process in Minnesota (Corporation Service Company, 380 Jackson Street - Suite 700, St. Paul, MN 55101) pursuant to Fed. R. Civ. P. 4(h)(1)(B). Service of process on XOC will be made by delivering a copy of the Summons and Complaint to XOCS' registered agent for service of process in Minnesota pursuant to Fed. R. Civ. P. 4(h)(1)(B) where, under Minnesota law, a subsidiary such as XOCS is an implied agent of its parent corporation.

## JURISDICTION

5. Because this action arises between citizens of different States and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, this court has jurisdiction over all of the claims set forth in this Complaint 28 U.S.C. § 1332(a).

6. This court has supplemental jurisdiction over plaintiff's state and common law claims by virtue of the provisions of 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States

Constitution.

## VENUE

7. Venue is proper in this district under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to InCompass' causes of action occurred in this judicial district.

8. Defendants XOCS and XOC shall properly be deemed to reside in this judicial district pursuant to 28 U.S.C. § 1391(c) and Minn. Stat. § 543.19 because they are subject to personal jurisdiction in this judicial district by virtue of their contacts with this judicial district, because, directly or through their subsidiaries, affiliates, or agents, they transacted business in Minnesota, because they obtained the benefits of the law of Minnesota and the Minnesota market for their products, because they committed acts outside Minnesota causing injury in Minnesota, and because they committed acts in Minnesota causing injury in Minnesota.

9. XOCS and XOC conduct and transact business with, or contract to supply goods or services to, customers located in Minnesota and in this district, both through a sales representative located in Minnesota and over the Internet using its interactive website, located at <http://www.xo.com>, and XOCS and XOC further conduct and transact business in this district by targeting their advertising of their goods and services to individuals or entities located in Minnesota using direct mail and their Internet website.

## FACTUAL BACKGROUND

10. In 2002, InCompass entered into a contract with XOCS. It was for XOCS to provide collocation services for InCompass' routers, firewalls and servers.

11. Under the contract, InCompass had a responsibility to pay monthly for

XOCS' service.

12. Under the contract, XOCS had a responsibility to provide Space (42U cabinets) for InCompass' equipment, Bandwidth (internet), Power, Cooling, and Security. These XO services were to be provided in a redundant manner, and were guaranteed by XO to be running 99.9999% of the time. If XOCS failed to meet this requirement under certain parameters, XO was to credit InCompass for such failures.

13. InCompass and its clients suffered approximately 24 outages from 2002 to present.

14. Although InCompass reported and copied XOCS management, and notified appropriate staff of such outages throughout the years, InCompass has never received a credit for any outages. In the past, XO management has apologized for the outages, and they stated they would go after some credits to help InCompass credit its clients, but no one ever followed through.

15. An outage is classified as an interruption in any one of the services XOCS was and is providing.

16. An outage can range from minor (a portion of XOCS' services) to severe (all or major pieces of XOCS' services) depending on what XOCS service is not functioning. Most of InCompass' outages were medium to severe, and they typically affected many clients at a time.

17. Medium to severe outages damage InCompass' reputation as a Cloud services provider, and InCompass has lost major project revenue, monthly revenue, and clients that usually have 2 to 3 year contracts. InCompass has, in the past, had to release clients out of their contracts because of outages that clients suffered.

18. The outages have occurred for many reasons. Sometimes XOCS owned

hardware or software failures, but since 2002, a good portion of them have been unplanned XOCS employee negligence and mistakes such as updating router configurations during the day without notifying InCompass, updating switch configurations without notification, making general changes without understanding the ramifications, and accidentally adjusting a setting whether it be in the engineering group or billing department. Because of the quantity of outages, InCompass staff got to know the local XO staff very well, and InCompass has kept very good documentation on what the causes of outages were.

19. The medium to severe outages were typically communicated directly to the local employees and not always through the main XOCS support line. XOCS' main support line, since 2002, has been very inefficient. Upon the first call-in, it could take 15 to 20 minutes just to get a ticket number. This would mean that InCompass' clients would be down for these 15 to 20 minutes without any trouble-shooting beginning. Also, it is well documented that XOCS support would not call InCompass' engineer on the status of issues for sometimes days after the issue had already been fixed. This caused significant anxiety with InCompass' clients as they could not be updated. To fix this situation, XOCS management gave InCompass an escalation call list. InCompass was directed to call the local engineers first to start the troubleshooting and then local management if they could not reach the engineers. This process helped, but it was not a proactive approach to avoid the outages to begin with.

20. Incompass has had four segments of its business devastated over the years by these outages.

21. The first being Bandwidth reselling. InCompass would refer XOCS into a client with multiple locations. XOCS would sell the client point to point T1s to

connect all the locations back to InCompass' cabinets at XOCS. Then InCompass would resell the bandwidth out of XOCS to the client. This worked very well, but XOCS, unfortunately, had many issues with employees tampering with the equipment and causing outages. Over time, InCompass clients got tired of the outages and left InCompass' bandwidth services.

22. The second segment is Monitoring services. InCompass monitors the health of its clients' servers, networks hardware and software 24x7. This is a critical function for many healthcare groups. If XOCS' services are down, InCompass' ability to adhere to its contracts to monitor clients is impaired. InCompass ran into many scenarios where it could not help a client because of the outages, and, therefore, InCompass would get decreased business or completely lose a client.

23. The third segment is Cloud services. InCompass has servers, routers and firewalls in XOCS' cabinets. They will provide everything a business or nonprofit needs to run its organization. It eliminates the need for local servers or infrastructure. InCompass has been providing this service since 2003. 99.9999% up-time is critical with this service, and this is why InCompass pays XOCS for its services. Unfortunately, there have been many unexpected outages, and InCompass' clients have suffered complete outages so they could not do any work for hours and sometimes days. InCompass has gotten decreased business as well as lost clients in this segment due to XOCS' negligence.

24. The last segment is Project services. Because most of InCompass' revenue comes from monthly revenue, the company is evaluated on its bandwidth, monitoring and cloud services. Because of XOCS' negligence, InCompass has lost, refunded and credited back projects to make up for the down-time clients have suffered.

25. In late 2005, InCompass discovered that XOCS was not holding up to its responsibility of keeping its equipment in its cabinet secure. XOCS had purchased and was using hundreds of the same style and manufacturer of cabinet throughout the main data center. The locks to the cabinets seemed to look the same. An InCompass staff member accidentally tried his key in another cabinet in another row. The employee was able to open someone else's cabinet. This was reported to Herb Hewitt (XOCS' local site engineer) immediately. Herb said that he would look into it. In 2007, another InCompass staff member forgot which cabinets were InCompass' and accidentally opened someone else's cabinet. Once again, it was reported immediately to Herb Hewitt, and he stated he would look into it. InCompass is not aware of an audit being done on the actual keys for the cabinet since 2002. Over the course of 8 years, InCompass has had some significant things moved, unplugged, and changed without its permission. In late 2010, InCompass engineers had to be deployed twice to fix connections in the cabinet that were physically moved by either an XOCS employee or an XOCS client. This caused outages for InCompass' clients.

26. InCompass and its clients have suffered many outages since 2002, but none was more evident and damaging than the one that occurred in January 2010.

27. An individual in the XOCS collections department accidentally shut off a portion of InCompass' account. This affected a large portion of InCompass' clients using services out of XOCS. Five engineers from InCompass spent an evening trying to troubleshoot it as XOCS thought it was "technical." After a day and a half, it was discovered that a person in the collections department accidentally shut off a portion of its account before that person went on vacation.

28. InCompass' CEO, Tim Lambrecht, tried to meet with Mark Feil, XOCS'

General Manager/VP, immediately, but Feil would not meet Lambrecht until the first week of February.

29. During the meeting, Lambrecht let Feil know what had happened and showed him documentation. Feil confirmed it and apologized to Lambrecht. Feil stated that he would immediately put together an apology letter for Lambrecht to give to his clients so InCompass' clients would know it was XOCS' negligence that caused the outage. Feil also promised to see if InCompass' damages would be covered by XOCS' insurance so InCompass could engage a marketing firm to repair its image and give some major credits to its clients that suffered the outage. Lambrecht had meetings scheduled with InCompass' clients, so it was decided that Lambrecht would let his clients know the strategy.

30. Lambrecht communicated the message to the clients as agreed.

31. Feil did not supply the letter or information on the insurance and instead disappeared for four months and would not return Lambrecht's regular phone calls or e-mails.

32. In July 2010, Lambrecht was finally able to leverage XOCS staff to get in touch with Feil. Feil apologized to Lambrecht. He stated that he was very busy closing $500,000 per month in sales for XO. Lambrecht asked Feil about the letter and the insurance money. Feil told Lambrecht that it was against corporate policy to produce such a letter, and that XOCS insurance would not cover the accidental outage, but he was still investigating it. Feil told Lambrecht that they would work things out the following week with some credits that InCompass was supposed to receive for overage charges. Lambrecht never heard from Feil again, regarding this issue, and was forced to file suit for the overages. To date, no credits have been received for any

outages.

## CAUSES OF ACTION

### Count I
### Breach of Contract

33. InCompass repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

34. Certain of the outages endured by InCompass and its clients since 2002 were the result of XOCS' gross negligence or willful misconduct.

35. Such negligence or willful misconduct constituted material breaches of the collocation license agreement entered into in 2003 and renewed every three years thereafter.

36. InCompass has been damaged and prejudiced by XOCS' breach of contract in an amount well in excess of $75,000.

## JURY DEMAND

37. Plaintiff InCompass demand a jury trial on all issues in this case which are triable to a jury.

## NOTICE OF INTENT TO SEEK PUNITIVE DAMAGES

PLEASE TAKE NOTICE that plaintiff will, in compliance with Minn. Stat. § 549.191, seek the court's permission to add a claim for punitive damages against defendants.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff InCompass IT, Inc., prays for:

1. An award of damages for breach of contract in an amount to be determined at trial;

2. An award of pre- and post-judgment interest to the maximum extent allowed by law;

3. An award of its costs of suit, including reasonable attorney's fees; and

4. Such other and further relief as the court deems just and equitable.

STANBURY LAW FIRM P.A.

Dated: March 7, 2011.

*Alfred Stanbury* (signature)

Alfred Stanbury
A.I.N. 190457
2209 St. Anthony Parkway
Minneapolis, MN 55418
(612) 789-5060
FAX (612) 706-8743
ATTORNEY FOR PLAINTIFF